# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| SANDY STAHLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:10-CV-439 |
| | ) | |
| AMALGAMATED TRANSIT UNION, | ) | |
| LOCAL 996, AND AMALGAMATED | ) | |
| TRANSIT UNION, AFL-CIO, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Sandy Stahly claims that she was the victim of race and sex discrimination while she was a bus driver for the South Bend Public Transportation Corporation ("TRANSPO") and a member of Amalgamated Transit Union Local 996. Only Stahly's claims against the union for violations of Title VII and Section 1981 remain. Stahly claims she was fired because she is white and because she is a woman and that the Union participated in the discrimination by failing to assist her in the grievance process against TRANSPO. She also claims a hostile work environment. The Union has moved for summary judgment on all claims [DE 45]. For the reasons discussed below, the motion is **GRANTED**.

## BACKGROUND

Sandy Stahly is a white female who worked as a bus driver for TRANSPO from June 8, 1998 until August 25, 2009 [DE 45-5 at ¶ 9; DE 45-3 at 85]. Stahly was a member of Amalgamated Transit Union Local 996, the labor union that represented TRANSPO workers [DE 45-1 at ¶¶ 3-4].

TRANSPO and the Union are the signatories to a Collective Bargaining Agreement, and the CBA sets forth the grievance procedures for Union members. To file a grievance, an employee contacts a Union representative who conducts an investigation [DE 45-1 at ¶ 7]. If the representative determines that the complaint is meritorious, he or she submits the written grievance to TRANSPO [*Id.*]. TRANSPO and the Union then resolve the grievance [DE 45-2 at 10] or, if they are unable to do so, the Union may submit the grievance to binding arbitration [DE 45-1 at ¶ 7; DE 45-2 at 10-11]. The Union votes internally on whether to send a particular grievance to arbitration [DE 45-1 at ¶ 8].

Ms. Stahly's earliest complaint about her Union representation stretches back to 2006: she claims that Union secretary Karen Foulks told her that TRANSPO did not like her or trust her, and that she would have been fired for accidents had supervisors not covered up the incidents for her [DE 45-3 at 31]. Stahly claims that she also spoke with others in the Union who insinuated that Freda Braylock, the Union President, was responsible for the accusations [DE 45-3 at 33]. According to Stahly, in 2008 or 2009, outside of Stahly's presence but in a break room with other Union officials, Foulks said "Let's get one more [write-up] so we can get her fired" [DE 45-3 at 33].

Ms. Stahly's disciplinary problems with TRANSPO began in earnest in March 2008, when she asked the Union to file a grievance on her behalf alleging disparate treatment in discipline [DE 45-11; DE 45-3 at 47-51]. The Union filed the grievance for her – denoted as Grievance 530. In it Stahly argued that the discipline she received was "inconsistent from event to event as well as more severe in comparison to other employees. I am being retaliated against for past complaints as well" [DE 45-11]. According to the official who handled the grievance,

Stahly complained that she was being disciplined more harshly than other drivers, including an African-American woman named Lois Boyd, that supervisors were looking at Stahly more closely than other bus drivers, and that Stahly could do no right in the supervisors' eyes while other drivers were "getting away with infractions" [DE 52-3 at 4-5]. To support her claim, Stahly gave the official a list of names with infractions that she claimed had not been charged, but the Union was unable to substantiate those events [*Id.* at 5]. Stahly requested that write-ups she received on March 7, 2008 be removed from her record, that she receive a day's pay, and that she receive a day of overtime pay [DE 45-11]. Stahly and TRANSPO settled the grievance with a compromise: some of the write-ups were removed, and Stahly didn't argue for any money – in fact, at her deposition, she testified that "I should've argued for the pay. But I just thought to hell with them; they can keep their money" [DE 45-3 at 48].

Stahly now claims that there were a number of problems with the way that the Union handled her grievance, and that the Union tried to "interfere" with the filing of the grievance. According to Stahly, Union President Freda Braylock tried to persuade Stahly's Union representative, Dan Warmoth, who is the executive Vice President of the Union, not to file the grievance [DE 45-3 at 48-49; DE 45-1 at ¶ 1; DE 52-3 at 3].[1] She also claims that during the grievance meeting, Braylock called and tried to interrupt the meeting, but the meeting proceeded and Stahly ended up with the settlement removing write-ups [DE 45-3 at 49].

In August 2008, at Stahly's request, the Union filed another grievance on her behalf, alleging disparate treatment in discipline [DE 45-12]. In this grievance, denoted as Grievance

---

[1] The basis for Ms. Stahly's knowledge of these events was talking to Warmoth, speaking to another Union employee, and a friend who told her that she had witnessed a confrontation between Warmoth and Braylock at a train station [DE 45-3 at 49]. The Union has not moved to strike these statements.

533, Stahly claimed that "Discipline that I receive is inconsistent from event to event as well as more severe in comparison to other employees. I feel that this is retaliation for past complaints, as well as being singled out for dismissal" [DE 45-12]. Stahly and her union representative attended a meeting at which the grievance was discussed, and it was denied by TRANSPO [DE 45-3 at 52].

Again, Stahly claims a number of deficiencies in the way that Grievance 533 was handled. For starters, she alleges that the Union made it "difficult" for her to file Grievance 533 [DE 51 at 3; DE 53-3 at 54]. Specifically, she argues that Braylock "tried to stop me from using Dan [Warmoth] or Jim Ford by saying that I had to use the stewards that were in my own department" [DE 45-3 at 52]. Stahly initially had to file the grievance with union representative Henry Widelski as her union steward, and when he asked her for examples to support her grievance, she contested the request because Warmoth was familiar with her past grievances [DE 45-3 at 53]. Braylock then consented to allowing Warmoth to represent her [*Id.*]. Stahly claims that this was "just more harassment basically from Freda" [DE 45-3 at 54].

Grievances 530 and 533, however, were precursors to the main event in this litigation: Stahly's Last Chance Agreement and subsequent termination. TRANSPO and the Union use a Last Chance Agreement which provides that when TRANSPO has charged an employee with an offense that would qualify an employee for discharge under the disciplinary code, the Union, TRANSPO, and the employee may enter into an agreement by which in exchange for TRANSPO not firing the employee, the employee and the Union agree not to file a grievance challenging the discipline and to a probation period for the employee [DE 45-1 at ¶ 10]. In the probationary period, if the employee doesn't meet the agreed-upon performance standards, TRANSPO can

fire the employee and the employee cannot avail herself of the grievance provisions of the CBA [*Id*.]. The accused employee also has the option of rejecting the Last Chance Agreement, being discharged and then filing a grievance challenging the discharge [DE 45-1 at ¶ 10].

On April 9, 2009, TRANSPO issued Stahly a disciplinary notice charging her with driving her bus "off-route." This was her third violation thus subjecting her to discharge [DE 45-1 at ¶ 13; DE 45-7]. According to the Discipline Report, TRANSPO was notified on April 7, 2009 that Stahly had driven an incorrect route on April 1, 2009 [DE 45-7]. These dates are important because according to the CBA, TRANSPO has five days after being made aware of a violation to issue discipline [DE 45-2 at 7].

On April 14, 2009, Stahly, a TRANSPO representative, and Warmoth and Braylock met to discuss the discipline [DE 45-6; DE 45-1 at ¶ 13]. Stahly had been suspended pending termination [DE 45-3 at 55]. Braylock informed Stahly that the Union would not argue that the discipline had been untimely – as it had, after all, been issued within five days of when TRANSPO was notified of the infraction – because the Union wanted to increase the chance that Stahly would be able to obtain a Last Chance Agreement [*Id.*]. And in fact, at the meeting, the parties negotiated a Last Chance Agreement that provided that Stahly could avoid termination and return to work in exchange for not filing a grievance related to the April 1 incident, going on probation, and foregoing the Union's grievance process and protections for any further discipline if TRANSPO found that she violated the terms of her probation [DE 45-6]. The two-year probation period allowed TRANSPO to discharge Stahly if she failed to report being off-route or failed to follow her "paddle," which was the prescribed route for the bus driver for a particular day, among other infractions [DE 45-6; DE 45-3 at 98]. Stahly could have accepted her

termination and pressed a grievance through the process outlined in the CBA [DE 45-1 at ¶ 13; DE 45-2 at 9]. But she chose the Last Chance Agreement option instead.

Stahly signed the agreement, acknowledging that "[b]y affixing her signature to this Agreement, Mrs. Stahly states that she has reached this agreement voluntarily after seeking Union representation and counsel, and that she considers the Agreement to be in her best interest" [DE 45-6]. Further, in exchange for the last chance agreement, Stahly understood that "the Union will not be able to pursue a grievance on her behalf should the company determine that a violation of this Agreement has occurred" [DE 45-6]. At the meeting, Stahly did not raise the issue of her race or sex as the reason she was being targeted for discipline [DE 45-3 at 88-89].

Stahly now claims that the dates in the April disciplinary notice were "fabricated" because "passengers don't call in six days later and say that somebody did something . . . that is just bogus," that the informant was in fact another bus driver who "tattletaled" on her, and that therefore, the Union should have pressed untimeliness as a defense to the earlier charge [DE 45-3 at 55, 57-58].

All did not go well during Stahly's probationary period: on the morning of August 19, 2009, after she reported for work but before she departed for her scheduled runs, Stahly received writeups for disregarding a red light, almost causing an accident; making an unauthorized visit to the Maintenance Department; and viewing video without proper authorization [DE 45-3 at 89-90, 120]. Stahly claims that these write ups were concocted by supervisors as "obvious harassment and bogus grievances . . . intentionally making up stuff to get me upset, and then sending me out to drive a bus full of 50 people in South Bend traffic, putting me in danger and

everybody on my bus in danger" [DE 45-3 at 119].

Later that day, TRANSPO also charged Stahly with "failure to follow paddle" and "operating off-route" [DE 45-1 at ¶ 15; DE 45-8]. Because these infractions were violations of the Last Chance Agreement, her employment was terminated [DE 45-1 at ¶ 15].

Stahly admits that she drove off-route, but posits that she only went off-route because her route was improperly changed without her knowledge, and that someone – at either TRANSPO, the Union, or both – "saw to it that the paperwork was not available to be viewed," though she does not "know who that somebody was, but somebody did it" [DE 45-3 at 93-97]. At her deposition, she also claimed that the reason that she went off route was because she was "upset" about the write ups earlier in the day [DE 45-3 at 119].

If TRANSPO alters bus drivers' scheduled runs, they must give drivers the opportunity to re-bid, according to seniority, on the routes [DE 45-1 at ¶ 17]. According to the Union, TRANSPO conducted such a bid in August 2009, and no member of the Union, including Stahly, ever contacted the Union and tried to file a grievance alleging that the bid was conducted improperly. [*Id.*]. However, Stahly claims that the Union failed to insure that the bid was conducted according to the CBA, because there was not a posting of the bid on employee bulletin boards [DE 45-3 at 95-98]. Because she didn't know about the bid, she says, she didn't pick up a new paddle, and didn't know that her route had changed [*Id.*].

While she was suspended but prior to her termination, Stahly filed a grievance over the writeups that she was given on the morning of August 19 [DE 45-3 at 121]. For the most part, the grievance was denied [DE 45-3 at 116-17]. According to Stahly, her union representative "did the best he could" to help her, but that "he knew [Blaylock] would sabotage anything he did

anyway" [DE 45-3 at 147].[2]  Ultimately, Stahly was terminated on August 25, 2009 [DE 45-5 at ¶ 9], and the termination was based on Stahly's driving off-route which was a violation of the terms of the Last Chance Agreement [DE 45-6 at 1].

According to Stahly, the Union should have filed a grievance over the conduct of the bid, and should have fought for her job when she went off-route as a result of the changed route – even though the LCA didn't allow the Union to do so – because there were "extenuating circumstances" [DE 45-3 at 95-98].  Because of the provisions of the LCA, the Union did not file any grievance contesting Stahly's discharge [DE 45-1 at ¶ 16].

Stahly filed a charge against the Union with the Equal Employment Opportunity Commission alleging race and sex discrimination, retaliation, and a hostile work environment, and that the Union had failed to fairly represent her in a dispute with TRANSPO and to ensure that the August 2009 bid was done correctly [DE 45-13].  Stahly also filed a civil rights lawsuit against TRANSPO [DE 45-9], and that case was settled [DE 45-10].  While the case against TRANSPO was pending, Stahly initiated this lawsuit against the Union [DE 45-14].

**DISCUSSION**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The non-moving party

---

[2]     Neither party included a copy of the writeup or grievance in their summary judgment submissions.

must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Stahly claims that the Union discriminated against her on the basis of her race and sex in the handling of her grievances against TRANSPO and that it created a hostile work environment, in violation of Title VII and Section 1981.

Before I address the merits of Stahly's claims, there is one procedural item of note: the Union has argued that some of the allegations Stahly has raised are untimely and cannot support her Title VII claims [DE 46 at 12]. Specifically, the Union argues that the Union's handling of Grievances 530 and 533, which were in March 2008 and August 2008, occurred outside the 300 day period prior to October 13, 2009, when Stahly filed her EEOC charge, and thus cannot be considered because "[t]he timely filing of the charge is a prerequisite to filing a lawsuit." *Id.* Stahly has not responded to this argument. The Union has acknowledged that these same allegations are not time-barred as to Stahly's Section 1981 claim. *Id.* However, according to the very case that the Union has cited in support of its argument, "[t]he timely filing of an EEOC charge is *not* a jurisdictional prerequisite to filing a federal lawsuit, but rather, is more akin to a statute of limitations and subject to waiver, estoppel, and equitable tolling under appropriate circumstances." *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Med. School*, 167 F.3d 1170, 1174 (7th Cir. 1999) (emphasis added). Though Stahly has not responded to the Union's claim of untimeliness or asserted that equitable tolling or estoppel should apply, it

is arguable that all of Stahly's allegations represent a course of conduct that I should consider as a whole in determining Stahly's discrimination claims – that tolling should apply, because a reasonable person would not have become aware of the "possibility" of a claim of discrimination until she was terminated.  *Id.*  As we will see below, the analysis is the same under both Title VII and Section 1981, and so even if I were to agree with the Union that the grievances cannot support Stahly's claims under Title VII, I must consider this evidence in assessing the motion for summary judgment on Stahly's Section 1981 claims – and even in doing so, I find that Stahly's claims fail.

**I.      Sex Discrimination Claim**

I will address Stahly's sex discrimination claim under Title VII first, because it can be disposed of quickly.  Quite frankly, the parties largely ignored the issue in the summary judgement briefing, and with good reason: no evidence exists that supports Stahly's claim of sex discrimination.

Title VII prohibits employers from discriminating on the basis of sex.  42 U.S.C. § 2000e-2(a).  "To succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and that the employer took this adverse action on account of the plaintiff's membership in the protected class."  *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013).  A Title VII plaintiff can respond to a motion for summary judgment using either the direct or indirect method of proof.  *Id.*; *Johnson v. Gen. Bd. Of Pension & Health Ben. of the United Methodist Church*, 733 F.3d 722, 727-28 (7th Cir. 2013). The direct method requires Stahly to provide either direct or circumstantial evidence of the

Union's discriminatory animus or retaliatory behavior; whereas the indirect method requires Stahly to follow the burden-shifting framework of the *McDonnell Douglas* test. *Morgan*, 724 F.3d at 995; *Johnson*, 733 F.3d at 727-28. Under the indirect method, Stahly must make out a prima facie case of discrimination or retaliation. Then the burden shifts to the Union to articulate a legitimate non-discriminatory reason for its action, and if it can do so, the burden shifts back to Stahly to show that the Union's reason is pretextual. *Id.* "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

Here, the sum total of Stahly's support for her claim of sex discrimination is this: "Stahly believes she was disciplined because she is a white, female [sic] and the union did not grieve her April 2009 discipline for time lines [sic] because of her race and sex even though the union knew that other bus operators who were male or black were not disciplined for the same violations" [DE 51 at 3]. But beyond this "belief," Stahly presents *no evidence* concerning any sex discrimination whatsoever, and ". . . conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Lucas v. Chicago Transit Authority,* 367 F.3d 714, 726 (7th Cir. 2004). So the direct method of proof fails because there is no direct or circumstantial evidence of sex discrimination.

As for the indirect method of proof, Stahly has failed to offer any evidence that the Union (or TRANSPO for that matter) treated similarly situated male employees more favorably. While Stahly has made some allegations that a female African-American bus driver – Lois Boyd – was treated less harshly than she was for similar infractions, there is no such evidence regarding any male bus drivers. Accordingly, Stahly has not established a prima facie case of sex

discrimination under the indirect method of proof. So the Union's Motion for Summary Judgment [DE 45] as to Stahly's Title VII sex discrimination claim is **GRANTED**.

## II. Race Discrimination Under Section 1981 and Title VII

Stahly also claims reverse race discrimination. 42 U.S.C. § 1981(b) proscribes racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Where a local union has a contract between itself and its members and the union represents its members in employment contracts, unions may not engage in racial discrimination against their members. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987); *Korzen v. Local Union 705*, 75 F.3d 285, 288 (7th Cir. 1996). "A § 1981 claim may be brought against a labor organization . . . when 'the collective bargaining agreement contains an express clause binding both the employer and the union not to discriminate on racial grounds' . . . and when the labor organization as the collective bargaining agent intentionally avoids asserting discrimination-based claims." *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 312 (7th Cir. 1996), quoting *Daniels v. Pipefitters Local Union 597*, 945 F.2d 906, 916 (7th Cir. 1991); *Goodman*, 482 U.S. at 669. The CBA in this case contained such language, so the § 1981 claim is a viable one.

The standards for proving a Title VII violation are essentially the same as a Section 1981 violation. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, n.2 (7th Cir. 2014); *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 658 (7th Cir. 2003). Under Title VII, a labor union cannot discriminate against any individual on the basis of race or sex. 42 U.S.C. § 2000e-2(c)(1). Accordingly, Stahly's Section 1981 and Title VII race discrimination claims are

analyzed under the same paradigm discussed above in connection with Stahly's sex discrimination claim. *See e.g. Johnson,* 733 F.3d at 727-28.

In its memorandum in support of its motion for summary judgment, the Union argued that where the basis of the discrimination claim is a union's failure to represent a member, the plaintiff must show that (1) the employer violated the collective bargaining agreement with respect to the plaintiff; (2) the union permitted the violation to go unrepaired, breaching the union's duty of fair representation; and (3) the union's actions were motivated by a discriminatory animus, and cited *Bugg v. Int'l Union of Allied Indus. Workers Local 507*, 674 F.2d 595, 598 n.5 (7th Cir. 1982) [DE 46 at 12]. At the time, this was a correct statement of the law. *See also*, *Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 866-67 (7th Cir. 1997); *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 542 (7th Cir. 1987).

However, the Seventh Circuit recently disavowed that language from *Greenslade* and *Bugg,* and held that "[n]othing in the text or genesis of Title VII suggests that claims against labor organizations should be treated differently" than claims against employers, and that the use of these elements "conflates Title VII with the elements of a hybrid breach-of-contract/duty-of-fair-representation claim against an employer and union under 29 U.S.C. § 185." *Green v. Fed'n of Teachers/Illinois Fed'n of Teachers Local 604*, 740 F.3d 1104, 1106 (7th Cir. 2014). Accordingly, "[a] claim against a labor organization under § 2000e–2(c)(1) or § 2000e–3(a) does not depend on showing that either the employer or the union violated any state statute or contract. Such a requirement cannot properly be added as part of the prima facie case," and so the claim must be evaluated under a straight Title VII analysis. *Id.* at 1107.

Therefore, Stahly "may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (internal citation and quotation omitted). In the alternative, under the indirect method of proof, she can attempt to show that she "is a member of a class protected by the statute, that [s]he has been the subject of some form of adverse employment action . . . and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan*, 724 F.3d at 995. Once she establishes that prima facie case, the burden shifts to the Union to articulate some legitimate, nondiscriminatory reason for its action. *Coleman*, 667 F.3d at 845. Once it does so, then Stahly must present evidence that the stated reason is a pretext. *Id.* at 846.

But there is an additional gloss – not discussed by the parties – in reverse race discrimination cases like this one. To make out a prima facie case, instead of proving that she is a member of a protected group, a plaintiff must show that "background circumstances" exist to merit an inference that the employer has "reason or inclination to discriminate invidiously against whites" or evidence that "there is something 'fishy' about the facts at hand." *Good v. Univ. of Chicago Medical Center*, 673 F.3d 670, 678 (7th Cir. 2012); *see also Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003); *Mills v. Health Care Service Corp.*, 171 F.3d 450, 457 (1999).

In this case, there is no direct or circumstantial evidence of the Union's discriminatory animus whatsoever, so Stahly cannot prevail under the direct method. Moreover, proceeding under the indirect method, Stahly cannot establish a prima facie case. First, beyond her own speculation, Stahly has failed to produce evidence of invidious discrimination against whites –

or, to put it another way, she hasn't provided evidence to support her prima facie case that something "fishy" was afoot at the Union. *See Phelan*, 347 F.3d at 684-85. To put it bluntly, there is not a shred of evidence that the Union engaged in behavior or made comments that suggested a discriminatory attitude against Caucasians generally or against Stahly because she was Caucasian. Though Stahly has alleged generally that African-American bus drivers were disciplined less harshly than she was, and she has named one African-American woman in particular, the record is devoid of any information about her that would permit a reasonable factfinder to conclude that the *Union* – not TRANSPO – was systematically treating whites less favorably than African-Americans. *See Good*, 673 F.3d at 679 (white plaintiff failed to present evidence "that could suggest to a reasonable jury that employer had any reason or inclination to discriminate against white persons" where only evidence was that three non-white employees were permitted to take demotions in lieu of termination, unlike plaintiff).

Moreover, as to the one comparator that Stahly has put forth, she has failed to demonstrate that she is "directly comparable to [her] in all material respects." *Hanners*, 674 F.3d at 692. Even taking a flexible approach to whether or not this employee is similarly situated to Stahly, *Coleman*, 667 F.3d at 851-52, there is no evidence as to whether this employee dealt with the same supervisor as Stahly (or, as applicable in this case, the same Union personnel), was subject to the same standards, or had engaged in similar conduct or was given similar discipline without differing or mitigating circumstances, and the Union treated her more favorably than Stahly. *Id.* at 692-93. Though Stahly has alleged that *TRANSPO* disciplined this employee less harshly than it disciplined Stahly, Stahly's complaint in this case is with the *Union* – and there is simply no evidence that the Union represented another, African-American

employee in a situation similar to one in which it failed to represent Stahly.  The record in this case is completely devoid of any facts that would link the Union's actions to any invidious discrimination against whites.

In sum, Stahly has presented no evidence that the Union failed to grieve her complaints because she was white, or that the Union had any kind of track record of doing so.  *See Green*, 740 F.3d at 1107 ("If the union would have processed Green's grievance or represented him . . . had he been white . . . then the union violated Title VII").  To the contrary, the evidence is that the Union processed each of her grievances – prior to the signing of the Last Chance Agreement, which I will discuss below – in a satisfactory manner.  Beyond Stahly's own rampant speculation that she was somehow "set up" or that fellow employees "tattletaled" on her, she has presented absolutely no evidence from which a reasonable factfinder could conclude that the Union took any of the actions it did because of Stahly is white.

Even if I were to find that Stahly somehow presented a prima facie case, the Union has articulated a legitimate, non-discriminatory reason for its actions: specifically, that it did in fact represent Stahly in her grievances against TRANSPO.  And the only time that it didn't do so was after Stahly signed a Last Chance Agreement that explicitly stated that in the case of further discipline issued by TRANSPO, the Union would not pursue any other grievances.  Stahly has no rejoinder to these reasons beyond her own rampant speculation, and absent any actual evidence to the contrary, Stahly's conclusory statements do not create an issue of fact.  *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006).

What's more, Stahly's complaints about the handling of the earlier grievances – Grievances 530 and 534 – are without merit.  It is true that a labor union's deliberate failure to

press grievances involving race discrimination is itself discrimination in the enforcement of a contract right that is actionable under Section 1981.  But for such a claim to be valid, the union has to purposely ignore the employee's complaint. *Allensworth v. Gen. Motors Corp.*, 945 F.2d 174, 179 (7th Cir. 1991).  Where a union negotiates a settlement with the employer on the plaintiff's behalf and thus decides not to pursue a grievance, the union's behavior does not violate Section 1981.  *Id.*  In *Allensworth*, the Seventh Circuit upheld the granting of summary judgment in a case similar to this one: the plaintiff there alleged that his union discriminated against him where it had, in lieu of pressing grievances, called a meeting of guilty parties and reprimanded them and then later authorized an investigation, adopted the investigation committee's recommendation, and negotiated a fair settlement with the employer, which the plaintiff rejected and then failed to avail himself of internal appeals procedures.  *Id.*  The Court found that the union's behavior in addressing the plaintiff's concerns was not actionable under Section 1981, because the union didn't ignore the plaintiff's assertions of racial discrimination – it in fact dealt with them.  *Id.*  That is precisely what the Union did here.

When one examines the details of how the Union dealt with Stahly's grievances, it shows how trivial Stahly's complaints truly are.  As for the Union's handling of Grievance 530, Stahly argues that Braylock tried to prohibit Warmoth from filing a grievance on Stahly's behalf, and that after the grievance was filed, Braylock attempted to meddle in it by calling during the middle of the grievance meeting.  This is a trifle.  The fact of the matter is that the grievance was filed, the meeting went ahead, and the grievance was resolved in a way that was beneficial to Stahly.  The Union fully represented Stahly, the parties compromised, some of the write-ups were removed from her record, and Stahly chose not to argue for back pay [DE 45-3 at 48].

There's not a shred of evidence that the Union acted in a discriminatory way.

Stahly's complaint as to the handling of Grievance 533 is even less compelling. Stahly argues that the Union made it "difficult" for her to file the grievance, because she was encouraged to use the correct union steward. After she complained, the Union permitted Stahly to use her chosen representative in fighting the grievance. In other words, she got exactly what she wanted, despite it being contrary to the Union's practices. Though Stahly considered this "just more harassment," quite simply, all Stahly has affirmatively shown is that she disagreed with the manner in which the Union presented her grievances. She has failed to show that the Union failed to represent her because of her race.

Stahly also takes issue with the manner in which the Union negotiated the Last Chance Agreement, and specifically, the Union's failure to argue that the discipline that she received was untimely. However, it is not disputed that TRANSPO issued the discipline within the five days after it received notice of the incident that was prescribed by the Collective Bargaining Agreement, which is why the Union says that it didn't argue that the discipline was untimely. Stahly posits that the Union should have argued timeliness instead of brokering the Last Chance Agreement, because in her opinion, the disciplinary notice was "bogus" and that a passenger would not have called in six days after the incident, and that it was more likely the work of a TRANSPO "tattletale" [DE 45-3 at 55, 57-58]. But beyond her own conjecture regarding the source of the tip that led to her discipline, there is no actual evidence that the discipline was issued in an untimely manner.

Here, there's no question that the Union's failure to press a losing argument was race neutral – it was based on a reasoned evaluation of the Collective Bargaining Agreement, which

clearly outlined that the discipline was imposed in a timely manner under the terms of the CBA. Moreover, in light of the fact that TRANSPO was ready to fire Stahly and the Union negotiated a Last Chance Agreement that allowed her to keep her job instead, it makes no sense that if the Union intended to discriminate against Stahly, that it would somehow find a way for her to keep her job. Stahly has offered no evidence that the Union's proffered reason for failing to argue that the discipline was untimely was pretextual.

On August 19, 2009, while the LCA was still in effect, Stahly deviated from her assigned route, which ultimately led to her termination. At her deposition, Stahly claimed that her failure to stay on her route was for two different reasons: first, she said she was rattled by the issuance of discipline earlier that morning; and second, she claimed that she did not know that her route had been changed because TRANSPO had conducted a bid without following the procedures outlined in the Collective Bargaining Agreement. Giving Stahly the benefit of the doubt and accepting both reasons as true, she still proceeded to go off-route, in violation of the Last Chance Agreement, meaning that TRANSPO was able to fire her immediately, without resorting to the grievance procedure. But because of the circumstances surrounding when she went off-route, Stahly contends that the Union should have represented her and somehow saved her job.

As an initial matter, "[a] last chance agreement like this one supersedes the relevant part of the CBA for a particular employee and must be enforced according to its terms," meaning that the terms of Last Chance Agreements control in situations where they alter the usual terms of the CBA. *Huber v. In'l Union of United Auto., Aerospace & Agr. Implement Workers of America*, 2005 WL 645158, at *6 (S.D. Ind. March 3, 2005), citing *Tootsie Roll Indus., Inc. v. Local Union No. 1*, 832 F.2d 81, 83-84 (7th Cir. 1987) (arbitrator's failure to consider the parties' last

chance agreement in construing provisions of collective bargaining agreement had effect of eliminating the agreement's provisions and thus his award was unenforceable); s*ee also Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688*, 959 F.2d 1438, 1440-41 (8th Cir. 1992) (last chance agreement superseded collective bargaining agreement); *Int'l Union of Operating Engineers, Local 351 v. Cooper Natural Resources, Inc.*, 163 F.3d 916, 919 (5th Cir. 1999) (" . . . last chance agreements constitute formal contractual settlements of labor disputes. Since LCAs follow collective bargaining agreements in time, they should be construed as superseding a CBA in certain circumstances because an LCA reflects the parties' own construction of the CBA").

The LCA in this case explicitly gave TRANSPO the right to discharge Stahly immediately for "[a]ny failure to follow paddle e.g. not following the prescribed route" [DE 45-6 at 1]. The agreement also stated that Stahly understood that "[b]y not being terminated at this time, and being given a final chance instead, she recognizes that the Union will not be able to pursue a grievance on her behalf should the company determine that a violation of this Agreement has occurred" [DE 45-6 at 2]. Stahly made the decision to sign the LCA. She did it to save her job. The LCA clearly states that by signing it, Stahly indicated that she "has reached this agreement voluntarily . . . and that she considers the agreement to be in her best interest" [DE 45-6 at 2] in exchange for not being fired [DE 45-3 at 80]. So the Union's proffered reason for its failure to challenge Stahly's termination was completely appropriate under the terms of the LCA. Though Stahly complains that there were "extenuating circumstances" that meant the Union should have somehow disregarded the LCA, none of these reasons is sufficient to raise a genuine issue of material fact as to whether the Union's reasons for not pressing a grievance are

pretextual.

Stahly also contends that the Union should have filed a grievance concerning the bidding process, which she claims was not conducted pursuant to the CBA. The Union has offered evidence that no member, including Stahly, asked it to file a grievance related to the conduct of the bid [DE 45-1 at ¶ 17]. Stahly has no rebuttal to this argument, and she has not alleged that she ever tried to file such a grievance. Accordingly, there is no evidence that the Union's proffered reason for not filing such a grievance is pretextual.

Stahly's final argument is that the Union did not appropriately represent her in connection with the discipline that she was issued on August 19, 2009 for disregarding a red light; almost causing an accident; making an unauthorized visit to the Maintenance Department; and viewing video without proper authorization, which she also claims were "bogus" and intended to rattle her before she left for her scheduled runs for the day [DE 45-3 at 89-90, 119-120]. The Union has countered that it did in fact represent her in that proceeding, and as a result, the unauthorized visit to the Maintenance Department charge was dropped, and the grievance as to the other two charges was denied [DE 45-3 at 116-17]. But in any event, those infractions, and the discipline she received as a result, did not result in her termination. It was what she did later in the day – driving off route – that led to her termination.

Accordingly, Stahly's claims of discrimination under Title VII and Section 1981 are without merit. There is simply no evidence from which a reasonable jury could determine that the Union acted in a discriminatory manner.

**III.** **The Union did not create a hostile work environment.**

Stahly's only remaining claim is that the Union created a hostile work environment. Stahly has not addressed this claim in her response to the Union's motion for summary judgment, and the Union argues that Stahly has "conceded" this claim and that summary judgment is thus appropriate [DE 54 at 3]. However, even where an opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only "*if appropriate* - that is, if the motion demonstrates that there is no genuine issue of material fact *and* that the movant is entitled to judgment as a matter of law." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 392 (7th Cir. 1995) (quoting *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (emphasis in original)). So even if all of the material facts are undisputed, I still must ascertain that judgment is proper "as a matter of governing law." *Id.* (citations omitted).

To establish a prima facie case for a hostile work environment under Title VII, Stahly must offer evidence that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [race]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012). In evaluating the evidence on this claim, the court looks to the totality of the circumstances, including "the severity of the  allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.* at 956.

There is simply no evidence to support a hostile work environment claim, whether it be based on race or gender. At most, the evidence shows that Foulks made comments regarding

TRANSPO's opinion of Stahly's job performance, and that Braylock was the source of those comments – none of which had anything to do with Stahly's race or gender. In any event, the comments are clearly not severe or pervasive, and Stahly's vague and conclusory allegations that she was "harassed" by Braylock or "set up" simply do not establish that the conduct Stahly was subjected to was objectively severe, offensive, or pervasive. *See Porter*, 700 F.3d at 956.

Finally, labor unions, unlike employers, do not have an "affirmative duty to prevent racial harassment or other forms of unlawful discrimination in the workplace." *Pipefitters Ass'n*, 334 F.3d at 661. Remember, TRANSPO was Stahly's employer – not the Union, and "[t]he company, not the union, controls the workplace . . . [t]he union is not the company, but the workers' agent in dealing with the company. If it discriminates in the performance of its agency function, it violates Title VII, but not otherwise." *Id*. at 659. Stahly has not established that the Union, who is not her employer, could be liable for hostile work conditions, even if they existed. For these reasons, the Union's motion for summary judgment on Stahly's hostile work environment claim is **GRANTED**.

## CONCLUSION

For the reasons stated above, the Motion for Summary Judgment [DE 45] is **GRANTED.** The Clerk is **DIRECTED** to enter judgment in favor of the Defendant and against the Plaintiff.


**SO ORDERED**.
ENTERED: March 3, 2014

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
